# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 19, 2010

## STATE OF TENNESSEE V. EZRA TAYLOR SHELTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-A-826      J. Randall Wyatt, Jr., Judge**

_____

### No. M2009-01974-CCA-R3-CD - Filed August 26, 2011

_____

Defendant, Ezra Taylor Shelton, was charged with first degree premeditated murder and felony murder. Following a jury trial, he was convicted of second degree murder and voluntary manslaughter. The trial court merged the offenses and imposed a sentence of fifteen years in the Department of Correction for the resulting conviction of second degree murder. On appeal, Defendant argues that (1) the evidence was insufficient to support his conviction for second degree murder; and (2) the trial court failed to "properly address an improper statement made by the prosecution during closing arguments." After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. DAVID H. WELLES, SP.J., not participating.

Dumaka Shabazz, Nashville, Tennessee, for the appellant, Ezra Taylor Shelton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General, Victor S. (Torry) Johnson, III, District Attorney General; Amy Eisenbeck, Assistant District Attorney General; and Elizabeth Foy, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

## I. Background

On the night of January 5, 2008, through the early morning hours of January 6, 2008, Carlton Glenn, Patrick Carter, Mario Mayes (the victim), Marquez Jones, Tiara Chatman,

Philesha Jones, Laurekka Chatman, Antwanikka Chatman, and other young individuals attended a going-away party for Jasmine Davis at 3117 Wilmoth Road in Davidson County. Mr. Glenn testified that at some point, James Evans arrived at the party and began dancing with Antwanikka Chatman, who was Mr. Glenn's girlfriend at the time. Someone then informed Mr. Evans that Antwanikka was Mr. Glenn's girlfriend, and he stopped dancing with her. Mr. Glenn and the victim were later over in the corner of the room talking, and Mr. Evans became upset over a song by "Little Boosie" that was played. He began yelling something about "gangsters." According to Mr. Glenn, Mr. Evans became "real hyped" and got into an altercation with Patrick Carter. Mr. Evans and Mr. Carter began flashing gang signs, and Mr. Evans left. As he was leaving, Mr. Evans said, "I don't care about dying and when [I] come back, something gonna [sic] go down."

Mr. Glenn testified that Mr. Evans returned to the party with "[Defendant] and like two or three other dudes." Defendant had what appeared to be a nine millimeter weapon tucked in the waistband of his pants. The group stayed at the party approximately ten minutes and then left. Mr. Glenn, the victim, and Mr. Carter were standing outside as Defendant, Mr. Evans, and Mr. Stephens were leaving. After they got into the car, Mr. Carter fired six shots at them with Mr. Glenn's .38 revolver but he did not hit anything. Mr. Glenn testified that Mr. Evans drove up the street to the light, got out of the car, and shot into the air. He then got back into the car and drove away. Mr. Glenn testified that everyone ran when Mr. Evans began shooting, and Mr. Glenn "ducked behind the van next door." The victim went into the house and called Mr. Glenn on his cell phone to see if he was alright.

Mr. Glenn testified that he and the victim then met back in the driveway, and Mr. Glenn saw Mr. Evans' car driving "fast" back down the street, and he heard gunshots. Mr. Glenn grabbed the victim's arm, and they began running down the driveway. He said, "[l]ike I looked - - I glanced back and I seen a gun out the window shooting and, then, I told him to duck. And, I pushed him and he said, 'oh,' and he fell." Mr. Glenn heard at least ten shots fired from the car, and they appeared to be shot from the back right passenger side. Mr. Glenn picked the victim up and saw that he had been shot in the head. Mr. Glenn spoke with Detective Danny Satterfield on January 18, 2008, but did not tell the whole story because he did not want to get his friends into trouble. He spoke with Detective Satterfield a second time on March 5, 2008, and told him everything. Mr. Glenn also identified Defendant from a photographic lineup.

Tiara Chatman testified that she was thirteen years old at the time of the shooting and attended the party with her sisters, Antwanikka and Laurekka. At some point, James Evans arrived at the party and began dancing with Antwanikka. Tiara testified that her sister pushed Mr. Evans off of her, and after that she saw Mr. Glenn and the victim in the corner talking. She then heard Mr. Evans say something about them plotting against him. Tiara

testified that Mr. Evans left the party and later returned with Defendant, Tylere Stephens, and another man. She said that Defendant had his shirt pulled up, and she saw a gun "on his waist." Tiara testified that sometime later she was in the house and heard gunshots. She walked outside and saw everyone running. She then heard a second set of shots. Tiara testified that she eventually spoke with police and identified Defendant from a photographic lineup.

Phileshia Jones testified that she saw Mr. Evans dancing at the party. He then left and came back with Defendant and Mr. Stephens. She heard one of the men say, "[W]as anybody (indiscernible) [sic] on me while we was gone[?]" Ms. Jones testified that the three men were in the house for no more than five minutes, and then they left. She later heard gunshots while she was inside the house. Ms. Jones testified that Tiara Chatman and the victim went outside after the shots were fired, and she heard a second round of shots a few minutes later. Ms. Jones later spoke with detectives and identified Mr. Evans from a photographic lineup. She was also shown a second lineup but was unable to identify anyone.

Zechiel Gilbert testified that he lives at 3127 Wilmoth Road, and there are six or seven houses located between his residence and the scene of the shooting. He said that during the early morning hours of January 6, 2008, he was awakened by gunshots. Mr. Gilbert looked out the window and saw a car sitting there with a man at the back of the car shooting toward 3117 Wilmoth Road. He said,

> After about two or three minutes he got back in the car - - uh - - and they drove over to Wilmoth Circle, which is a little culdesac [sic] where they parked, talked to a SUV for about five minutes.
>
> The SUV then left onto Spears Road and the car turned about around, went back towards [3117].

Mr. Gilbert testified that after the car drove back down the road, he heard more gunshots.

Sixteen-year-old Antwanikka Chatman testified that while she was at the party, a man in a red shirt began "dancing on [her]." She said the victim then told Mr. Glenn, her boyfriend, "Man, you ain't gonna take that are you?" Mr. Glenn and the victim then walked over to a corner and began talking, and the man in the red shirt walked outside. Antwanikka testified that before the man in the red shirt left, "[h]e said when he come [sic] back something gonna [sic] go down." She said that the man came back approximately twenty minutes later with Mr. Stephens, Defendant, and other "dudes." Antwanikka testified that the man in the red shirt asked if anyone had been "plotting" on him. The men stayed at the party two or three minutes and left. Mr. Carter, the victim, Mr. Glenn, and Marques Jones

then went outside after them. Antiwanikka later heard gunshots, and after one or two minutes, she heard a second round of shots. She then looked out the door and saw the victim fall with his cell phone in his hand. Antwanikka testified that there were multiple routes to leave the neighborhood.

Marques Jones testified that he walked to the party with the victim and Mr. Glenn. They arrived about 8:30 p.m., and everyone was having a good time. At some point, Mr. Evans arrived and after he was at the party for a while, he became offended by a song that was played. Mr. Jones testified that Mr. Evans got mad and began yelling some about "gangsters" and things of that nature. He explained that a word in the song was disrespectful to a particular gang. Although Mr. Jones did not see Mr. Evans dancing with Antwanikka Chatman, he heard Mr. Glenn tell Mr. Evans, "That's my gal." To which Mr. Evans replied, "My bad." Mr. Jones saw the victim and Mr. Glenn in the corner talking during the party.

Mr. Jones testified that Mr. Evans left the party at some point and returned ten to fifteen minutes later with seven or eight other people, including Defendant. He said that Mr. Carter then walked up to him and asked him to go outside. Mr. Jones took that to mean that Mr. Carter thought something was going to happen. He said that Mr. Glenn had a gun at the time which Mr. Carter took and shot toward Mr. Evans after he got into a car. Mr. Jones testified that he, Mr. Carter, and Mr. Carter's brother then ran to Mr. Carter's apartment in Knoll Crest and remained there. Mr. Jones called the victim who said that he was in the house at 3117 Wilmoth. He later identified Defendant from a photographic lineup.

Fifteen-year-old Laurekka Chatman testified that while she was at the party, Mr. Evans began dancing with her sister, Antwanikka. She said,

> uh - - he was dancing on her and, then, Velle [Mr. Glenn], he was looking like . . . cause that's his girlfriend. So, the dude got up and he's like, "My bad. Is this your girlfriend?" And, then, he was like, "Yeah." And, he said something "I'm just trying to be me (phonetic)", something like that.

Laurekka testified that Mr. Evans then said that something was going to "go down" when he came back. Laurekka testified that Mr. Evans left and came back with five people, including Mr. Stephens and defendant. She said that Mr. Evans asked if anyone had been "plotting" on him and then left. Mr. Glenn, the victim, and Tiara Chatman also went outside when the men left. Laurekka then heard around seven gunshots. Around five minutes later, she heard a second round of shots. Laurekka later spoke with police and identified Defendant and Mr. Evans from a photographic lineup.

Dr. Tom Deering performed an autopsy on the nineteen-year-old victim. He testified that the victim died from a gunshot wound to the head, and he determined that if the victim was shot with a handgun, it was more than two feet away. Dr. Deering said that there was no alcohol or drugs in the victim's system.

Tylere Stephens testified that Defendant was at his house on January 5-6, 2008. At some point, Mr. Evans stopped by and asked them to go to a party. Mr. Stephens thought that Mr. Evans said that he had been "disrespected" by someone at the party over a song, and Mr. Evans indicated that there might be some fighting at the party. Mr. Stephens said that there were other people in the car with Mr. Evans when he and Defendant got in, including a "Crip dude" who said that he was "going to probably get to shooting." They arrived at the party and remained there for five to ten minutes, and as they were leaving, Mr. Stephens testified that someone began shooting at them. He said that he and the others ran back to the car and drove away. Mr. Stephens thought that Mr. Evans was sitting in the front passenger seat, and Defendant, who was armed with a gun around a foot long, was beside Mr. Stephens in the back seat near the window.

Mr. Stephens testified that he and the others drove down the street and attempted to leave the neighborhood but could not get out and had to turn the car around. He claimed that they had to drive back by 3117 Wilmoth to get back on the main road. Mr. Stephens testified that people began shooting at them as they drove back by the party, and Defendant and Mr. Evans shot back. He told police that he heard eight or nine shots fired out of the car, and he told them that defendant began shooting all the way down the street until they passed the house.

On cross-examination, Mr. Stephens testified that he and the others went to the party to have a good time. They did not intend to kill or hurt anyone or to confront anyone. Mr. Stephens testified that Mr. Evans indicated that there might be a fight because he did not know how everyone would react when they went back to the party. He said that the shooting by Patrick Carter was unprovoked, and that Mr. Carter was still shooting when they drove back by the house.

Co-defendant James Evans, whose case had been severed from Defendant's, testified that he had not received a deal from the State in exchange for his testimony. However, he hoped to obtain one. Mr. Evans testified that he went to the party on Wilmoth Road and began dancing with Antwanikka Chatman. At first he did not know that she was someone else's girlfriend, and her boyfriend pushed him and told him to get away from her. Mr. Evans testified that he later saw Ms. Chatman's boyfriend talking to the victim, and Mr. Evans decided to leave the party. He drove down the street to Tylere Stephens' house, and he, Defendant, and Mr. Stephens decided to go back to the party to pick up Mr. Evans' sister

and cousin. They walked in the house, got his sister and cousin, and walked back out. Mr. Evans testified that he got back in the car with Defendant and Mr. Stephens, and as they pulled away, Patrick Carter began firing at them. He said that he also fired shots into the air as they drove away. His sister, cousin, and a friend were in another car. Mr. Evans agreed that he drove "a couple of houses up," turned around, and drove back by 3117 Wilmoth. He said that as they drove back by the house, he began "shooting towards where the people was at." Defendant was also shooting toward the people.

On cross-examination, Mr. Evans admitted that he initially told police that he was in St. Louis at the time of the shooting. He testified that he did not return to the party to hurt or kill anyone. He also said that there was no arguing with anyone or threats before the shooting began. However, Mr. Evans testified that some of the people at the party were giving him a "crazy look," which made him uncomfortable, and he decided to leave. He said that he was trying to clear a path at the time of the shooting to make sure that they could get away.

Officer Aaron Wigginton of the Metropolitan Nashville Police Department testified that he responded to a shots fired call around the Wilmoth Road area. The call was later upgraded to a shooting of a person. He arrived on the scene and saw the unarmed victim laying on the ground unresponsive with labored breathing. He remained with the victim until an ambulance arrived.

Officer James Slusser testified that he was on Brick Church Pike around 1:00 a.m. on January 6, 2008, writing a report when he heard shots fired near him. Within moments, there was a report of a shots fired call off of Wilmoth Road. As he was driving down Wilmoth, the call was upgraded to a shooting of a person. Officer Slusser stopped in front of the residence at 3117 Wilmoth, and people began emerging from their houses. He was then directed to where the victim was lying in the driveway.

Sergeant Brad Turner arrived on the scene and assisted in setting up a perimeter and securing the scene. He said that because shell casings where found on the scene, the decision was made to call out the identification section of the police department. Sergeant Turner then interviewed witnesses and took a statement from Mr. Gilbert. He spoke with several young people and determined that there had been a party. They denied that the party was gang-related. On cross-examination, Sergeant Turner testified that Jamie Gilbert indicated that someone said that "James shot Mario."

Detective Warren Fleak, a crime scene investigator, testified that he was dispatched to 3117 Wilmoth Road during the early morning hours of January 6, 2008. He said that the residence was not on a dead end street, and there were a number of ways to drive out of the

area. Detective Fleak photographed the scene and collected twelve nine millimeter shell casings. He did not collected any .38 caliber casings because a .38 revolver typically retains the casings. Detective Fleak testified that the shells were located between 3121 and 3123 Wilmoth Road. Ten of them were some distance behind a van that was struck.

Detective Danny Satterfield testified that he was assigned to investigate the victim's death. He interviewed many people, and developed a lead. Defendant's step-father gave Defendant's name as Ezra Taylor Shelton; however, the photographic lineup which Detective Satterfield put together indicated the name of Patrick Shelton. He also put together a photographic lineup with Mr. Evans' photograph and showed both lineups to several witnesses. Detective Satterfield testified that of the twelve shell casings that were recovered from the scene, nine were fired from the same weapon, and three were fired from a separate weapon.

## Analysis

### I. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to support his conviction for second degree murder because he asserts that he acted in self-defense.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W. 3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-13-302(b).

Viewing the evidence in a light most favorable to the State, the proof shows that James Evans went to a party at 3117 Wilmoth Road, and after dancing with Carlton Glenn's girlfriend, Antwanikka Chatman, became upset over a song that was played because he felt "disrespected." He then got into some type of altercation with Patrick Carter, and the two flashed gang signs at each other. Mr. Evans then left the party and said that something was going to "go down" when he returned. He drove down the road to Tylere Stephens' house and told Mr. Stephens and Defendant that he had gotten into trouble with someone and had been "disrespected" by a song. Mr. Evans then asked Defendant and Mr. Stephens to return to the party with him, and he indicated that there might be some fighting. The three men returned to the party, and Defendant had his shirt pulled up revealing what appeared to be a nine millimeter weapon tucked into the waistband of his pants. Mr. Evans then asked if anyone had been "plotting" against him.

Although Patrick Carter fired shots at Mr. Evans, Defendant, and Mr. Stephens as they left the party, he did not hit anything, and the men were able to drive away unharmed. Instead of leaving the area, Mr. Evans drove to a street light, got out of the car, and fired shots toward the residence at 3117 Wilmoth. Mr. Gilbert testified that he saw Mr. Evans' car drive over to Wilmoth Circle and talk with the occupants of an SUV for about five minutes. Mr. Evans then drove back towards 3117 Wilmoth, where people were gathered outside the house, and he and Defendant fired their weapons out of the car at the people who were standing outside. The unarmed victim began running down the driveway and was fatally shot in the back of the head. Twelve nine millimeter shell casings were recovered from the scene. Nine were fired from one weapon and three were fired from another. Although Mr. Stephens and Mr. Evans claimed that they had to drive back by the residence to escape from the neighborhood, both Antwanikka Chatman and Detective Fleak testified that there were multiple other routes to leave the area.

As noted above, Defendant's challenge to the sufficiency of the evidence is based solely on his assertion that the State failed to prove beyond a reasonable doubt that he did not act in self-defense.

> When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. *State v. Sims*,

-8-

45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Thomas Eugene Lester*, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App., at Knoxville, June 25, 1998), *perm. app. denied,* (Tenn. Feb. 1, 1999) (citing *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. *See Goode*, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the [Appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

*State v. Phillip Lynn Dorse*, No. W2010-00685-CCA-R3-CD, 2011 WL 2306235 (Tenn. Crim. App. June 7, 2011). In this case, Defendant has not met his burden of showing that the evidence raises a reasonable doubt that his conduct was criminal. The jury, within its prerogative, rejected Defendant's claim of self-defense and convicted him of second degree murder. This court will not second-guess factual determinations made by the jury.

Although it is not contested by Defendant, we also conclude that there is sufficient evidence of criminal responsibility by Defendant. A defendant may be convicted of the commission of an offense under a theory of criminal responsibility. *See* T.C.A. § 39-11-401(b). Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, ... based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Although the proof was not clear as to whether Defendant or Mr. Evans' bullet struck the victim, it did show that they were acting in concert, and each was criminally responsible for the other.

Based on our review, we find that a rational trier of fact could conclude beyond a reasonable doubt that Defendant knowingly killed or was criminally responsible for killing the unarmed victim as he was running away and that Defendant was not shooting the weapon in self-defense. Defendant is not entitled to relief on this issue.

## II.     Prosecutorial Misconduct

Defendant argues that the trial court "erred in failing to address an improper statement made by the prosecution during closing arguments."  Specifically, he challenges the prosecutor's statement that Dr. Deering testified that a nine millimeter bullet killed the victim.

Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, argument must be temperate, "predicated on evidence introduced during the trial," and relevant to the issues being tried. *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

Initially, we note that defendant failed to contemporaneously object to the prosecutor's statement.  Generally, when a prosecutor's statements were not the subject of a contemporaneous objection, the issue is waived.  Tenn. R. Crim. P. 33 and Tenn. R. App. P. 36(a); *see also State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); *State v. Green,* 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997).  This Court, however, has in its discretion periodically reviewed allegations of prosecutorial misconduct even in the absence of a contemporaneous objection through the process of "plain error" review set forth in Rule 52 of the Tennessee Rules of Criminal Procedure. *State v. Armstrong*, 256 S.W.3d 243, 249 (Tenn. Crim. App. 2008) (citations omitted).  Rule 36(b) provides that:

> [w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

Tenn. R. Crim. P. 36(b).

To recognize the existence of plain error, this court must find each of the following five factors applicable: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the factors first articulated in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also* Tenn. R. Crim. P. 52(b). "[A] complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied." *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) (citing *Smith*, 24 S.W.3d at 283).

For a "substantial right" of the defendant to have been effected, the error must have prejudiced the defendant. "In other words, it must have affected the outcome of the trial court proceedings." *Armstrong*, 226 S.W.3d at 250 (citing *United States v. Olano,* 507 U.S. 725, 732-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (analyzing the substantially similar Fed. R. Crim. P. 52(b)); *Adkisson*, 899 S.W.2d at 642.

During rebuttal closing argument, the prosecutor stated: "You heard Dr. Deering say that a nine millimeter was the kind of bullet that killed him. Well, you also heard one of the police officers indicate that a nine millimeter bullet could not be shot out of a .38." At the close of the prosecutor's argument, defense counsel pointed out to the trial court that Dr. Deering did not testify that a nine millimeter bullet killed the victim. The court noted that defense counsel should have objected at that time, and counsel said, "I should have." The following exchange then took place:

> [Defense Counsel]: Well, all I want you to do is tell the Jury that may have been, in fact, what he said. Because he didn't say that.

> THE COURT: I wish you had told me at the time, because, now, it's after all the arguments are over. You can just say you're not certain. If you can do that, and then we'll just leave it at that. I'm not saying you did say it. Whatever way you want to say it. And I don't think you did intentionally at all. So do you want to correct that?

> [Prosecutor]: Yes, Your Honor.

> THE COURT: Then that will eliminate that. Okay. Thank you.

The prosecutor then made the following statement to the jury:

> Well, in spite of the dramatic ending, apparently we're going to have just a little more chat. You are the judges of the facts of this case. And I indicated that the doctor testified that a nine milimeter [sic] bullet was the bullet that killed Mario Mayes. And the doctor's report will be in evidence and you will be able to read all that. And that is for you to determine in regards to what you believe killed him.

Defense counsel did not object to the curative statement made by the prosecutor.

-11-

In its order denying Defendant's motion for new trial, the trial court stated:

The Court finds that during the State's rebuttal closing argument, General Elizabeth Foy stated that the medical examiner testified that a 9mm bullet killed the victim in this case. The Court finds that the Defendant objected to this statement after the State's argument had concluded, arguing that the medical examiner never made this statement on the witness stand. The Court finds that a compromise between both parties was reached whereby the State, through General Foy, would make a final statement to the jurors that her attempted paraphrasing of the medical examiner's statement on the issue was not evidence and that only the examiner's testimony itself was to be considered as evidence. The Court finds that the Defendant agreed to this compromise and therefore waived the issue. The Court also finds that, even if the issue was not waived, any error resulting from General Foy's misstatement was ultimately cured by her final statement to the jury. The Court therefore finds that this issue is without merit.

At the hearing on the motion for new trial, defense counsel told the court that he did not "believe at all that [the prosecutor] had any intent to go outside or to be malicious or underhanded in saying this."

Based on our review and given the facts and circumstances of the case, we conclude that the prosecutor's comments did not affect the outcome of the trial. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE
